**Affirmed and Memorandum Opinion filed April 29, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-20-00766-CV

## IN THE INTEREST OF J.B., A CHILD

**On Appeal from the 314th District Court
Harris County, Texas
Trial Court Cause No. 2019-01718J**

## M E M O R A N D U M   O P I N I O N

The trial court terminated a mother's parental rights to her four-year-old child, J.B., on predicate grounds of endangering conduct and failure to comply with her family service plan. The court also found that termination was in the child's best interest and appointed the Department of Family and Protective Services (the "Department") as sole managing conservator. On appeal, the mother challenges the legal and factual sufficiency of the evidence to support the predicate grounds, as well as the best-interest finding and the appointment of the Department as J.B.'s managing conservator. Because we conclude that legally and factually sufficient evidence supports the trial court's findings of endangering conduct, best interest, and

the appointment of the Department as J.B.'s managing conservator, we affirm the judgment.

## Background

On April 23, 2019, the Department filed a petition to terminate the parental rights of J.B.'s mother ("Mother"). J.B., born June 15, 2016, was removed from Mother's care on April 23, 2019 pursuant to an emergency order for protection that appointed the Department J.B.'s emergency temporary sole managing conservator. The trial on the Department's petition commenced briefly on July 23, 2020, then recessed and recommenced on October 1, 2020. The following evidence was presented at trial.

J.B. came to the Department's attention after he was taken to Memorial Hermann Hospital on April 18, 2019 for injuries sustained in a car accident. J.B., then two years old, was ejected forty feet from the vehicle during a crash. Mother testified that J.B. was properly restrained in the vehicle and only received minor bruising in the accident. However, according to hospital records, J.B. was not properly restrained, "ha[d] abrasions on his face consistent with a MVA," had "numerous abrasions to face and upper torso," and suffered bruising to "90 percent of his face."

Mother was in the vehicle and also ejected. She lost consciousness at the scene and was taken to the hospital by ambulance. According to Mother's hospital records, she was an unrestrained passenger in the car. The car's driver was cited for driving while intoxicated. A social work consult clinical note provides, "Upon arrival, Xanax bars from Mexico were found on Mom's person. Mom was under the influence of something and a full tox screen was ordered. Mom was screaming, cursing[,] and attempting to pull all of the medical equipment out. CPS report made." Mother's emergency room discharge summary states that her "tox [screen]

2

was positive for amphetamines, benzos, and opiates. She was noted to be very drowsy and lethargic thought to be secondary to drug intoxication." Mother testified that she was not intoxicated at the time of the accident and denied possessing or using Xanax. According to Mother's medical records, she was admitted for observation after being seen in the emergency room and discharged on April 20, 2019. J.B. was discharged to the Department on April 23.

On June 18, 2019, the Department was appointed J.B.'s temporary managing conservator. The Department filed a family service plan, which the court approved and incorporated into a status hearing order.[1] Mother's service plan required her to: (1) take parenting classes; (2) maintain stable and appropriate housing and provide the Department with a copy of her lease agreement; (3) maintain stable and legal employment and provide the Department with a copy of her pay stubs; (4) not engage in criminal activity; (5) maintain contact with and give the Department truthful information and attend all meetings, court hearings, and visits with J.B.; (6) participate in a drug and alcohol assessment and follow all recommendations from the assessment, including that she complete an outpatient substance abuse program; (7) submit to random drug testing; (8) undergo both a psychological assessment and a psychiatric evaluation and follow the recommendations from each; (9) maintain compliance with her medications; and (10) participate in individual counseling.

According to the Department's caseworker, Steven Mayol, Mother attended court hearings and meetings for much of the pendency of this case. Mother testified that she completed her parenting classes. She attended monthly visits with J.B., except from November 2019 to February 2020, during which time she was

---

[1] Although Mother did not sign the service plan, she acknowledged during trial that she received a copy.

3

incarcerated after being arrested for aggravated robbery with a deadly weapon. Most of her visits were unremarkable and appropriate, except for one in April 2020. At that visit, Department caseworker Ashley Edwards described Mother as erratic and crying; Mother arrived to the visit 30 minutes late. During this visit, Mother repeatedly asked J.B. if he was being abused in his foster home. Although J.B. responded in the negative, Mother continued asking until J.B. nodded his head, "yes." At that point, Edwards stated that the visit became "completely out of control" and Mother became "verbally aggressive" toward the foster father.

Mother confirmed that she suffered from depression and anxiety and was prescribed medication for both, but she did not comply with her medication regimen. Mother failed to maintain safe and stable housing or provide the Department with a copy of any lease. At trial, Mother said she had a two-year lease on a home appropriate for J.B. She stated that she provided a copy of her lease to her attorney during trial, but it is undisputed that she did not provide a copy of any lease to the Department, as required by her family service plan. Mother also failed to find or maintain a job,[2] and she did not complete her psychological evaluation or participate in individual counseling.

Mother completed a drug and alcohol assessment and enrolled in a recommended substance abuse outpatient program, but she was "unsuccessfully discharged" from that program[3] and later enrolled in another "intensive outpatient"

_____

[2] Mother testified that she was self-employed cleaning houses, but she acknowledged she never sent any information to the Department to verify her employment. She also stated that she was not currently working due to the COVID-19 pandemic.

[3] Mother did not complete this program due to her arrest and incarceration for aggravated robbery, described below. Mother did not engage in any drug abuse counseling while she was in jail.

program. Mother confirmed that, as of the time of trial, she had not yet completed the substance abuse program.

Pursuant to Mother's family service plan, she agreed to provide random hair and urine samples for drug testing; the Department would consider any "adulterated samples or no-show as a POSITIVE test result." In 2019, Mother submitted to seven hair follicle tests as part of this random drug testing requirement. Only one of these tests was negative; the remaining six tests were positive for substances including cocaine, methamphetamine, amphetamine, and benzoylecgonine. Subsequently, Mother refused to submit samples for random hair follicle tests ordered on April 16, 2020; May 6, 2020; May 26, 2020; June 3, 2020; and June 22, 2020. Mother submitted to ten urine drug tests in 2019, all of which were negative except for an October 20, 2019 test that was positive for ethyl glucuronide.[4] In 2020, Mother's urine drug tests on March 19, 2020; March 21, 2020; April 17, 2020; and June 4, 2020 were negative. She refused to submit a urine sample on June 22, 2020.

Mother acknowledged that she tested positive for methamphetamines several times during the pendency of this suit, but she did not want to discuss the frequency of her methamphetamine use and stated she was currently enrolled in a drug recovery program. However, Mother testified that she had relapsed with methamphetamine use about two weeks before trial. She agreed that it was important for J.B. to have a drug-free caregiver. According to Mother, her drug use began after the car accident that resulted in J.B.'s hospitalization and removal. Mother stated that, if she had possession of her son, she would not use drugs.

---

[4] Ethyl glucuronide is a metabolite of ethanol formed in the body, usually from drinking alcoholic beverages. *See* Ethyl glucuronide, Wikipedia, https://en.wikipedia.org/wiki/Ethyl_glucuronide#cite_note-pmid19340678-1 (last visited Apr. 22, 2021).

5

The court also heard evidence that Mother was arrested several times while this case was pending and she was under the family service plan. Mother was arrested in June 2019 for misdemeanor theft. She was arrested for aggravated robbery with a deadly weapon in November 2019, which resulted in her incarceration until February 2020 on that charge. She was arrested in June 2020 for possession of a methamphetamine. In January 2010, several years before J.B.'s birth, Mother was convicted of aggravated robbery and sentenced to eight years' incarceration. Mother also acknowledged older convictions for theft in 2004 and burglary of a motor vehicle in 2008.

Department caseworker Mayol described J.B. as a friendly, playful, caring, and intelligent child who enjoys playing outdoors. According to Mayol, J.B.'s foster homes have met all of his physical and emotional needs. J.B. was in his fourth foster home, which was not "ideal." Mother testified that J.B. moved foster homes so frequently because the foster families could not handle J.B.'s behavior. However, Mother testified that J.B. never exhibited any concerning behaviors or "mood disorder" when she visited with him.

J.B.'s guardian ad litem, Jenny Yang, testified that J.B. is doing very well in his current foster placement. She did not believe that J.B. should be returned to Mother's care because she has not maintained sobriety and the consistent presence necessary to properly parent J.B.

J.B.'s current foster family had agreed to adopt J.B. if his parents' parental rights were terminated. J.B.'s current foster mother testified that he was doing "really well" in her home. According to her, J.B. was bonding with "everybody in the home." J.B. called his foster parents "mommy" and "daddy." J.B.'s foster mother described him as a very affectionate little boy who enjoyed company. Additionally, she stated that her parents live less than a mile away and were

6

experienced former public education teachers and administrators. J.B. "instantly took to them." The foster mother explained that J.B. was enrolled in a pre-K program that was to start shortly. She also testified that the foster family was aware of various programs to assist them as an adoptive family, such as free school meals through the school district and college tuition assistance for J.B. J.B.'s foster mother described her hopes and dreams for J.B. as follows:

> [J.B.] is a great kid. He's very intelligent. He has a big heart, and I think he'll do really, really well in a supportive environment. So we would just love to see him have a happy childhood, lots of love and support throughout the years, help him find his passions and his dreams and help him pursue those so that he can be a respectful, compassionate adult when he grows up.

At the conclusion of the trial, the court found clear and convincing evidence that: (1) Mother engaged in conduct or knowingly placed J.B. with persons who engaged in conduct and endangered his physical or emotional well-being; and (2) Mother did not comply with the provisions of the court-ordered service plan. *See* Tex. Fam. Code § 161.001(b)(1)(E), (O). The court further found that termination of Mother's rights was in J.B.'s best interest and that the Department should be appointed J.B.'s sole managing conservator. *See id.* § 161.001(b)(2). Based on these findings, the court signed a final order terminating Mother's parental rights to J.B.

Mother timely appealed.

## Analysis

### A. Standards of Review

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section 161.001(b) and that termination is in the best interest of the child under subsection (2). Tex.

7

Fam. Code § 161.001; *In re N.G.*, 577 S.W.3d 230, 232 (Tex. 2019) (per curiam); *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005). Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights. *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.). Although parental rights are of constitutional magnitude, they are not absolute. *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002).

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002). "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264. This heightened burden of proof results in a "correspondingly searching standard of appellate review." *In re A.C.*, 560 S.W.3d at 630; *see also In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531.

Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings, and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B.    Predicate Grounds

### 1.    *Applicable law*

In her first two issues, Mother argues the evidence is legally and factually insufficient to support termination under the predicate grounds on which the court relied, namely subsections 161.001(b)(1)(E) and (O). To affirm a termination judgment on appeal, a court need uphold only one termination ground—in addition to upholding a challenged best-interest finding—even if the trial court based the termination on more than one ground. *In re N.G.*, 577 S.W.3d at 232; *In re L.M.*, 572 S.W.3d 823, 832 (Tex. App.—Houston [14th Dist.] 2019, no pet.). Further, due to the significant collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E),[5] "[a]llowing section 161.001(b)(1)(D) or (E) findings to go

---

[5] Section 161.001(b)(1)(M) provides that parental rights may be terminated if clear and convincing evidence supports a finding that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state."

unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d at 237. Thus, when, as here, a parent challenges predicate termination grounds under subsection 161.001(b)(1)(E), we must address them and detail our analysis. *See id.* We will address the trial court's finding of endangerment under subsection (E). If we conclude that Mother's termination of parental rights is supported under that subsection, then we need not address whether termination is also supported under subsection (O). *See id.* at 232.

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection (E) requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection (E) must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

---

Tex. Fam. Code § 161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children.

Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent may establish an endangering course of conduct. *In re S.R.*, 452 S.W.3d at 360-61; *In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Routinely subjecting children to the probability that they will be left alone because their parent is in jail endangers children's physical and emotional well-being. *See In re L.M.*, 572 S.W.3d at 834 & n.4. Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533-34 (Tex. 1987). As well, a parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re A.L.H.*, 515 S.W.3d at 92.

Drug abuse is merely one form of criminal conduct that may jeopardize a child's physical or emotional health and thus constitute endangering conduct. *In re M.J.*, No. 14-20-00449-CV, 2020 WL 7038526, at *6 (Tex. App.—Houston [14th Dist.] Dec. 1, 2020, no pet.) (mem. op.). A parent's drug abuse after a child is born may be an endangering course of conduct under subsection (E) because it can negatively impact the user's ability to parent in multiple ways, not only by exposing the child to the possibility that the parent may be imprisoned but also because drugs can physically impair a mother's or father's capacity to parent. *See Walker v. Tex. Dep't of Family & Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied); *see also In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591, at *6 (Tex. App.—Houston [14th Dist.] Apr. 25, 2019, pet. denied) (mem. op.) ("Drug abuse and its effect on the ability to parent can present an endangering course of conduct.").

2.    *Application*

Our record contains ample evidence of Mother's continuing course of narcotics use during the pendency of this case.  She tested positive numerous times for various illegal substances, particularly cocaine and methamphetamines.  As well, she refused several drug tests during 2020,[6] and her service plan included a warning that any no shows would be taken as positive drug tests.  *See In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.) (fact finder may reasonably infer that parent's failure to submit to drug tests indicates parent is avoiding testing because parent was using drugs); *In re J.M.T.*, 519 S.W.3d 258, 269 (Tex. App.—Houston [1st Dist.] 2017, pet. denied) (same); *In re W.E.C.*, 110 S.W.3d 231, 239 (Tex. App.—Fort Worth 2003, no pet.) (same).

Additionally, Mother acknowledged that she relapsed and used methamphetamine only two weeks before trial.  This court has held that a parent's decision to engage in illegal drug use during the pendency of a termination suit, when the parent is at risk of losing the child, may support a finding to a clear and convincing degree that the parent engaged in conduct that endangered the child's physical or emotional well-being.  *See In re A.M.*, 495 S.W.3d 573, 580 (Tex. App.—Houston [1st Dist.] 2016, pet. denied); *In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *7 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.); *see also In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied).

Here, in addition to Mother's course of narcotics use during the pendency of the suit, the trial court heard evidence of Mother's several arrests for offenses during the pendency of the suit, one of which resulted in a four-month incarceration.  A fact

---

[6] The trial occurred in July and October 2020.

12

finder reasonably could find that this conduct subjected J.B. to a probability of being left alone because Mother is in jail, also endangering the child's physical and emotional well-being. *See, e.g.*, *In re T.G.R.-M.*, 404 S.W.3d 7, 15 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (evidence of mother's arrests after she knew her parental rights were in jeopardy supported a finding of endangerment). The clear and convincing evidence of Mother's criminal history and jail time after J.B.'s birth establishes an endangering course of conduct. *See In re A.A.C.*, No. 14-19-00560-CV, 2019 WL 6913327, at *7 (Tex. App.—Houston [14th Dist.] Dec. 19, 2019, no pet.) (mem. op.).[7]

We thus conclude that the fact finder could have formed a firm belief or conviction that its endangerment finding under subsection (E) was true.[8] *E.g.*, *In re A.M.*, 495 S.W.3d at 579-80; *J.O.A.*, 283 S.W.3d at 344.

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that termination of Mother's parental rights to J.B. was justified under Family Code section

---

[7] Mother complains that the trial court erroneously admitted evidence of stale convictions for aggravated robbery, theft, and burglary. Because we conclude the record is sufficient to support the court's endangerment finding notwithstanding this evidence, we need not address Mother's argument.

[8] A majority of this court sitting en banc recently held that "a parent's drug use alone, without proof of any causal connection to endangering their children's welfare," is not enough to justify terminating a parent-child relationship. *In re L.C.L.*, 599 S.W.3d 79, 86 (Tex. App.—Houston [14th Dist.] 2020, pet. filed) (en banc). In *L.C.L.*, the court's en banc majority noted the absence of evidence of criminal charges related to the parent's drug use or "proof of threat of incarceration due to alleged drug use." *Id.* at 84-85. Here, both exist; there is evidence that Mother was arrested for possession of methamphetamine on June 15, 2020, during the pendency of this suit. Additionally, although Mother denied being intoxicated on the evening of the car accident that prompted J.B.'s removal from her care, her medical records indicate that she tested positive for "amphetamines, benzos, and opiates" and that bars of Xanax were found on her person. This evidence leads us to conclude that sufficient evidence supports the court's finding under subsection (E).

161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection (E) finding.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection (E), we need not review the sufficiency of the evidence to support the subsection (O) finding. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule Mother's first and second issues.

## C. Child's Best Interest

In Mother's third issue, she challenges the legal and factual sufficiency of the evidence to support the trial court's best-interest finding.

### 1. *Applicable law*

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d at 266; *see also* Tex. Fam. Code § 263.307(b)

14

(listing factors to consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72.

We review the *Holley* factors in light of the evidence at trial. Applying them, we observe that neither party presented testimony regarding J.B.'s desires. However, J.B.'s foster mother testified that J.B. has bonded well with his foster family, including his foster father, sister, and grandparents. *See In re L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (when children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent).

2.      *Application*

Mother continued to use drugs during the pendency of the suit and was arrested on three different criminal charges while J.B. was in foster care. The same evidence, described above, that supports the trial court's finding of endangerment also supports a finding that Mother's pattern of inappropriate behaviors during J.B.'s life has jeopardized and would continue to jeopardize J.B.'s physical and emotional well-being. *See In re M.G.D.*, 108 S.W.3d 508, 511 (Tex. App.—Houston [14th Dist.] 2003, pet. denied); *see also In re M.D.*, No. 14-20-00244-CV, 2020 WL 5626273, at *9 (Tex. App.—Houston [14th Dist.] Sept. 21, 2020, no pet.) (mem.

op.) (parent's substance abuse supports a finding that termination is in child's best interest); *In re E.R.W.*, 528 S.W.3d at 266 (fact finder can give "great weight" to "significant factor" of drug-related conduct" in determining child's best interest).

Although Mother claimed she had a stable home appropriate for J.B., the Department's caseworker testified that Mother had not shown a stable home or income as required by her service plan. The trial court reasonably could have concluded that Mother's instability, including a lack of a stable home, continued drug use, and criminal history, supported a conclusion that termination was in J.B.'s best interest. *See In re S.R.*, 452 S.W.3d 351, 368 (Tex. App.—Houston [14th Dist.] 2014, pet. denied).

A court may consider whether a parent demonstrated willingness to effect positive environmental and personal changes within a reasonable amount of time. *See* Tex. Fam. Code § 263.307(b)(11). Although Mother had complied with portions of her family service plan, she did not establish that she: had a stable home; had stable and legal income; refrained from using illegal drugs; refrained from engaging in criminal activity; completed her psychological assessment or any psychological counseling; or was compliant with her medical regimen for the treatment of her ongoing psychological issues. From Mother's failure to show a willingness to effect positive environmental and personal changes, the trial court reasonably could have inferred Mother's parental abilities weighed in favor of finding termination was in J.B.'s best interest.

Finally, J.B.'s current foster family has expressed a desire to adopt J.B. He has bonded well with his foster family, and the family has provided a safe and stable home for him. J.B.'s foster mother displayed a knowledge of and willingness to engage in services available to help J.B. have a safe and stable future.

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Mother's's parental rights was in J.B.'s best interest. *See id.* § 161.001(b)(2).

We overrule Mother's third issue.

## D.    Conservatorship

In her fourth issue, Mother argues the evidence is legally and factually insufficient to support the trial court's finding that appointment of the Department as sole managing conservator is in J.B.s best interest.

We review a trial court's appointment of a non-parent as sole managing conservator for abuse of discretion and reverse only if we determine the appointment is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007). When, as here, an appellant challenges the legal and factual sufficiency of the evidence in a case where the proper standard is abuse of discretion, we engage in a two-pronged analysis: (1) whether the trial court had sufficient information upon which to exercise its discretion, and (2) whether the trial court erred in its application of discretion. *In re J.J.G.*, 540 S.W.3d 44, 55 (Tex. App.—Houston [1st Dist.] 2017, no pet.).

Texas Family Code section 161.207, entitled "Appointment of Managing Conservator on Termination," provides: "If the court terminates the parent-child relationship with respect to both parents or to the only living parent, the court shall appoint a suitable, competent adult, the Department of Family and Protective Services, or a licensed child-placing agency as managing conservator of the child." Tex. Fam. Code § 161.207(a).  The trial court's appointment of the Department as

sole managing conservator may be considered a consequence of termination. *In re I.L.G.*, 531 S.W.3d 346, 357 (Tex. App.—Houston [14th Dist.] 2017, pet. denied). Having found the evidence sufficient to support the predicate ground and best-interest finding, we conclude the trial court had sufficient information upon which to exercise its discretion and did not abuse its discretion in appointing the Department as J.B.'s sole managing conservator. *See In re L.G.R.*, 498 S.W.3d at 207 (finding no abuse of discretion in conservatorship finding where the evidence was sufficient to support termination of parental rights).

We overrule Mother's fourth issue.

### Conclusion

We affirm the trial court's judgment.

/s/    Kevin Jewell
       Justice

Panel consists of Justices Jewell, Bourliot, and Hassan.